UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

CASE NO.: 16-16492-F

NORIS BABB,
        Plaintiff-Appellant,

v.

ROBERT A. MCDONALD, *Secretary*,
DEPARTMENT OF VETERANS AFFAIRS,
        Defendant-Appellee.

---

On Appeal from the United States District Court
For The Middle District of Florida
Case No. 8:14-cv-1732-T-33TBM

---

APPELLANT'S INITIAL BRIEF

---

JOSEPH D. MAGRI
Merkle, Magri & Meythaler, P.A.
5601 Mariner St., Ste. 400
Tampa, Florida 33609
Telephone: (813) 281-9000
Florida Bar No.: 0814490
Email: jmagri@merklemagri.com
Counsel for Appellant
Noris Babb

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT**

I hereby disclose the following pursuant to this Court's interested persons rule:

1. the name of each person, attorney, association of persons, firm, law firm, partnership, and corporation that has or may have an interest in the outcome of this action including subsidiaries, conglomerates, affiliates, parent corporations, publicly-traded companies that own 10% or more of a party's stock, and all other identifiable legal entities related to any party in the case:

Appellate Division of United States Attorney's Office (AUSA unknown)

Babb, Noris

Bentley, A. Lee, III, United States Attorney

Covington, Virginia M. Hernandez, United States District Court Judge

C.W. Young VA Healthcare System a/k/a Bay Pines VA Healthcare System

Department of Veterans Affairs

Kenneth, Michael, AUSA

Magri, Joseph D.

McCoun, Hon. Thomas B., III, United States Magistrate Judge

McDonald, Robert A., Secretary of Department of Veterans Affairs

Merkle Magri & Meythaler, P.A.

Meythaler, Ward A.

United States Attorney's Office


2. the name of every other entity whose publicly-traded stock, equity, or debt may be substantially affected by the outcome of the proceedings:

None.

3. the name of every other entity which is likely to be an active participant in the proceedings, including the debtor and members of the creditors' committee (or twenty largest unsecured creditors) in bankruptcy cases:

None.

4. the name of each victim (individual or corporate) of civil and criminal conduct alleged to be wrongful, including every person who may be entitled to restitution:

Noris Babb

I hereby certify that, except as disclosed above, I am unaware of any actual or potential conflict of interest involving the district judge and magistrate judge assigned to this case, and will immediately notify the Court in writing on learning of any such conflict.

Respectfully submitted,


__/s/   *Joseph D. Magri*____
Joseph D. Magri
Florida Bar Number:  0814490
Merkle Magri & Meythaler, P.A.
5601 Mariner Street, Suite 400
Tampa, FL 33609-3452
Telephone:  813-281-9000
Attorneys for Appellant

## STATEMENT REGARDING ORAL ARGUMENT

Appellant's counsel believes oral argument would be helpful. Several of the issues in this case fall within areas of apparent conflict within Eleventh Circuit case law. The resolution of such issues could conflict with precedent of other Circuits as well as the United States Supreme Court.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ................................................. i

TABLE OF CONTENTS ................................................................................. i

TABLE OF CITATIONS ............................................................................... iii

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION ....1

STATEMENT OF THE ISSUES ......................................................................2

STATEMENT OF THE CASE .........................................................................3

STATEMENT OF PROCEEDINGS AND DISPOSITION IN THE COURT BELOW ......................................................................................................3

STATEMENT OF THE FACTS .......................................................................4

STATEMENT OF THE STANDARD OF REVIEW ..........................................24

SUMMARY OF ARGUMENT ........................................................................26

ARGUMENT ...............................................................................................29

    I.   THE DISTRICT COURT ERRED IN DECIDING THERE WERE NO DISPUTED ISSUES OF MATERIAL FACT PRESENTING A TRIABLE ISSUE ON RETALIATION. ................................................................29

    II.   THE DISTRICT COURT'S ORDER SHOULD BE REVERSED FOR FAILING TO ALLOW APPELLANT TO PROVE DISCRIMINATION AND RETALIATION CLAIMS UNDER A MOTIVATING FACTOR TEST UNDER QUIGG, 42 U.S.C. § 2000e-2(m); 29 U.S.C. §633a OR 42 U.S.C. §2000e-16 ......................................................................................40

        A. The District Court Erred By Failing To Apply Quigg To The Appellant's Mixed-Motive Discrimination Claims .........................................41

        B. The District Court Erred By Failing To Consider Age Discrimination Or Retaliation Was A Motivating Factor In Actions Taken Against Appellant ............................................................................................43

i

III. THE DISTRICT COURT SHOULD BE REVERSED BECAUSE THE EVIDENCE WAS SUFFICIENT TO RAISE A JURY QUESTION OF WHETHER DISCRIMINATION OR RETALIATION OR BOTH WAS A MOTIVATING FACTOR FOR THOSE ACTIONS .........................................47

A. Gender Plus Claims .......................................................48

B. Retaliation.......................................................................56

IV. THE DISTRICT COURT ERRED IN DISMISSING THE HOSTILE WORK ENVIRONMENT CLAIM ....................................................56

V. THE DISTRICT COURT ERRED BY APPLYING A STANDARD REJECTED BY THE SUPREME COURT TO APPELLANT'S QUALIFICATIONS AND FAILED TO CONSIDER THAT EVIDENCE CUMULATIVELY WITH PLAINITFF'S OTHER EVIDENCE OF PRETEXT ……………………………………………………………………...58

CONCLUSION ................................................................................59

CERTIFICATE OF COMPLIANCE....................................................60

CERTIFICATE OF SERVICE ............................................................60

# TABLE OF CITATIONS

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)............................................25

*Ash v. Tyson Foods, Inc.*, 392 F. App'x 817 (11th Cir. 2010) ...............................59

*Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006) ................................................. 29, 58

*Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) ........................39

*Complainant v. Dep't of Homeland Sec.*, EEOC DOC 0720140014, 2015 WL 5042782 (Aug. 19, 2015)...................................................................................46

*Complainant v. Dep't of Homeland Sec.*, EEOC DOC 0720140037, 2015 WL 3542586 (May 29, 2015)...................................................................................47

*Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354 (11th Cir. 1999) ....36

*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)...................................................42

*E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067 (11th Cir. 1990) ...................36

*E.E.O.C. v. TBC Corp.*, 532 Fed. App'x 901 (11th Cir. 2013) ..............................41

*Fogelman v. Mercy Hosp.*, 283 F.3d 561 (3d Cir. 2002).................................. 38, 54

*Ford v. Mabus,* 629 F.3d 198 (D.C. Cir. 2010) ............................................... 28, 45

*Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261 (11th Cir. 2008).......................51

*Goldsmith v. City of Atmore*, 996 F.2d 1155 (11th Cir. 1993) ...............................34

*Gomez-Perez v. Potter*, 553 U.S. 474 (2008) .........................................................28

*Gowski v. Peake,* 682 F.3d 1299 (11th Cir. 2012)...................................................57

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).................................. 43, 44, 45

*Heffernan v. City of Paterson*, 136 S. Ct. 1412 (2016) ..................................... 39, 53

*Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220 (11th Cir. 2002) . 25, 26

*Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321 (11th Cir. 1998) ..............36

*King v. Butts Cnty., Ga.*, 576 Fed. App'x 923 (11th Cir. 2014) ..............................25

*Lee v. Russell County Bd. Of Educ.,* 689 F.2d 769 (11th Cir. 1982) .......................36

*McDonnell Douglas, Inc. v. Green,* 411 U.S. 792 (1973) ............................... passim

*Mells*, No. 8:13-cv-3214-T-30TGW, 2015 WL 4716212 (M.D. Fla. Aug. 7, 2015) ........................................................................................................................59

*Merritt v. Dillard Paper Co.,*120 F.3d 1181 (11th Cir. 1997).................................36

*National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002) ..........................57

*Petitioner v. Dep't of Interior*, EEOC DOC 0320110050, 2014 WL 3788011 (July 16, 2014) ..........................................................................................................45

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)........................................ 41, 43

*Quigg v. Thomas Cnty. Sch. Dist.,*814 F.3d 1227 (11th Cir. 2016)................. passim

*Roper v. Foley*, 177 Fed. App'x 40 (11th Cir. 2006)...............................................59

*Savage v. Dep't of Army*, 122 M.S.P.R. 612 (Sept. 3, 2015)............................ 29, 46

*Shields v. Fort James Corp.,* 305 F.3d 1280 (11th Cir. 2002) ................................57

*Smith v. Lockheed Martin Corp.,* 644 F.3d 1321 (11th Cir. 2011).........................27

*Taylor v. Peerless Indus., Inc.*, 211 Fed. App'x 248 (5th Cir. 2006) .............. 29, 41

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).......................... 30, 35

*Trask v. Dep't of Veterans Affairs*, 822 F.3d 1179 (11th Cir. 2016).....................52

*U.S. v. Brown*, 53 F.3d 312 (11th Cir. 1995) .........................................................55

*Univ. of Tex. SW Med. Ctr. v. Nassar*, 133 S.Ct. 2517 (2013) ..............................46

*White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008) ............ 42, 43

*Wingate v. U.S. Postal Serv.*, 118 M.S.P.R. 566 (2012)........................................45

**Statutes**

28 U.S.C. § 1291 ......................................................................................1

29 U.S.C. § 626(d)(3).............................................................................38

29 U.S.C. § 633a ............................................................................. 28, 45

29 U.S.C. § 633a(f)................................................................................38

42 U.S.C. § 2000e-16.............................................................................28

42 U.S.C. § 2000e-16(f)........................................................................38

42 U.S.C. § 2000e-3(a) .........................................................................46

42 U.S.C. § 2000e-5(e)(3).....................................................................38

42 U.S.C. § 2000e-5(g)(2)(B) ...............................................................43

5 U.S.C. § 6103......................................................................................38

5 U.S.C. § 6121(5)(A)...........................................................................38

5 U.S.C. § 6124......................................................................................38

**Other Authorities**

11th Circuit Committee on Pattern Jury Instructions, <u>Civil Pattern Jury Instructions</u> 3.5.1 (2013) .........................................................................54

David Neumark et al., *Is It Harder for Older Workers to Find Jobs? New and Improved Evidence from a Field Experiment* (NBER Working Paper No. 21669, Oct. 2015), http://www.nber.org/papers/w21669 ................................................20

EEOC Enforcement Guidance on Retaliation and Related Issues, No. 915.004, 2016 WL 4688886 (Aug. 25, 2016)....................................................29

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

This is a direct appeal from a final judgment of the United States District Court for the Middle District of Florida dismissing all of Appellant's claims with prejudice.  This court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Appellant Noris Babb will address the following issues:

1.  Whether the District Court erred in deciding disputed issues of material fact and ignoring evidence of retaliatory intent and pretext when granting summary judgment on the retaliation claim.

2.  Whether the District Court erred by failing to apply *Quigg v. Thomas County School District* to Appellant's mixed-motive discrimination claims and ignoring Appellant's arguments.

3.  Whether the District court erred by failing to consider whether discrimination or retaliation was a motivating factor in adverse actions taken against Appellant.

4.  Whether the District Court erred by finding no reasonable jury could determine that Appellant was subjected to a hostile work environment.

5.  Whether the District Court erred by applying a standard regarding relative qualifications that was previously rejected by the United States Supreme Court.

## STATEMENT OF THE CASE

This appeal arises out of Appellant's action seeking damages and injunctive relief against the Department of Veterans Affairs. At the time she initiated her informal EEO complaint, Appellant was a 52-year-old GS-12 clinical pharmacist assigned to the Geriatric Primary Care ("GPC" or "Geri-PACT) clinic at the C.W. Bill Young VA Medical Center, which is a part of the Bay Pines Health Care System ("Bay Pines"). Appellant alleges that she was subject to discrimination, retaliation, and a discriminatory and retaliatory hostile work environment in violation of Title VII of the Civil Rights Act and the Age Discrimination in Employment Act of 1967.

## STATEMENT OF PROCEEDINGS AND DISPOSITION IN THE COURT BELOW

On July 17, 2014 Appellant filed her initial Complaint and Demand for Jury Trial. On October 10, 2014 she filed her first Amended Complaint. On November 12, 2014 she filed her Second Amended Complaint. In response to the district court's order granting Appellee's Motion to Dismiss, Appellant filed her Third Amended Complaint on December 19, 2014. On April 11, 2016 Appellee filed its Motion for Summary Judgment. On May 18, 2016 Appellant filed her Opposition to Appellee's MSJ. On June 1, 2016 Appellee filed its Reply to Appellant's Opposition. On June 13, 2016 Appellant filed her

Surreply. On August 23, 2016 the District Court granted Appellee's MSJ and order the case closed.

## STATEMENT OF THE FACTS

1. Babb joined the VA in 2004 and helped to develop the Geriatric Pharmacotherapy Clinic (GPC). Doc.68-2:2-4¶/s1-7. The GPC served older veterans living with disease states and disabilities common to both old age and military service. As such, they present special challenges when considering co-morbidities throughout the caregiving process including during the administration of medications. Those special challenges have been recognized for years by all people involved in that process, including the VA Central Office (VACO). *Id*. and Doc.68-4:15-33. It was not new in 2012.

2. Babb was a highly successful pharmacist. Doc.68-2:4¶7. In 2009 Babb was given an advance scope by prior Pharmacy Management (Chief Dr. Paul Laucka) because the way GPC operated prior to 2012 necessitated that Babb have an advance scope to prescribe medications as part of her disease state management (DSM) duties. Doc.68-2:3¶6. Laucka retired in 2009 and Wilson replaced him. He appointed Justice (then 42) and Camaro West Lee (then 43) as the Associate Chiefs.

3. In 2011, Babb (then 50) and other PACT pharmacists who had

4

advanced scopes allowing them to prescribe medications became Clinical Pharmacy Specialists (CPS). Doc.68-2:4¶s7,8.[1]  She observed the CPS positions were being denied to all five older females over the age of 45 who had held positions reclassified as PACT positions. Doc.68-3:120(p213:2-214:17);68-6:86-88;68-4:91(Q10). This included two with advanced scopes. Doc.68-2:16-17¶36.  In April and May 2012 she gave statements supporting two others, Drs. Anita Truitt and Donna Trask who had filed an EEO. (Doc.68-4:88-109)  Babb's EEO activity in Trask and Truitt's cases included: participating in their administrative case by providing 3 statements in April and May 2012; being listed as a witness in December 2012 interrogatory answers provided to the VA attorneys who also handle Babb's case (Doc.68-6:66-69); discussing her opposition to discrimination with Justice in February 2013; and by providing deposition testimony in their Federal Court case in March 2014.

[1] By way of background, the VA developed Patient Aligned Care Team (PACT) program which was implemented at Bay Pines in 2010 and 2011.  Dr. Todd Kaleel, then Acting Chief of Primary Care and currently its Chief Medical Officer, described the purpose of PACT as a way to provide veterans' healthcare through a team which follows a patient and takes care of their total aspects of health. Doc.68-3:116-117(pp.23-26).  In essence it is similar to the way the GPC had been operating. Not all VA facilities operated as the GPC did, however, and the PACT program was implemented through a geri-PACT system.  The documents sent out by the VACO emphasize the considerations discussed above that require  individuals to spend more time with a patient and to consider a broad range of co-morbidities associated with these particular patients. Doc.68-4:15-33.

Doc.68-2:6,13-16¶s9,24,28,29,30.   Doc.68-6:1-76 contains documents and dates. *Id*. Babb's EEO activity also included filing informal and formal complaints in her own case, testifying in those cases, conducting discovery and mediating the case; filing a federal complaint and participation in that case. Doc.68-2:15-16¶30;  Doc.68-5:56-92 which contains documents showing contact and dates. See also Doc.68-5:93-117; EEOC Compliance Manual §8-IIC1 (describes participation).

4.     By the end of 2012 the new Pharmacy Management had negotiated an agreement with Geriatrics (the Agreement) which took away central parts of Babb's duties relating to her advance scope. Doc.68-2:7-8¶12;Doc.68-4:47. After removing her duties on December 12, 2012 Pharmacy Management uncharacteristically immediately (December 13, 2013) began the process to remove Babb's advance scope. Compare Doc**.**68-4:67 with ¶9 *infra*. On February 15, 2013 Pharmacy Management took away Babb's advance scope while she was entering a prescription in the computer because under the Agreement she no longer needed one. Doc.68-2:10¶19. Babb had been told not to be involved in the negotiation of the Agreement. Doc.68-2:7-8¶12. Conversely, Dr. Lindsey Childs, (age 30 in 2012) and Dr. William Lavinghousez (32 in 2012), who were also then GS-12 CPSs like Babb, were

allowed to participate in negotiations for an agreement in their areas. Doc.68-2:7-8¶12.

5.      Before Geriatrics management testified, Pharmacy management claimed that Geriatrics did not want Babb to perform DSM and that demand necessitated a complete deletion of those duties from the Agreement. Doc.68-2:129(pp.21:9-22:19);Doc.68-3:17(pp.61-63:19);Doc.68-3:87-88(pp.16:8-17:17); Doc.68-3:104. Pharmacy's version of the Agreement deleted all of those duties. Doc.68-4:47;Doc.52:8-9¶10. The testimony by the Chief of Geriatrics, Dr. Leonard Williams and the director of GPC, Dr. John Hull, directly contradict pharmacy's testimony. Doc.68-3:42(pp.17:2-20:12); Doc.68-3:47-48(pp.18:8-21:8). That testimony is supported by 2012 emails to Pharmacy Management. Doc.68-4:50-61. In discussing how they wanted the clinic to continue to operate the way it was, Williams pointed out that he and Hull realized that pharmacy was taking the position that there had to be slots specifically set up.  Doc.68-3:41-42(p16-17). He asked Hull how many DSM slots would allow them the flexibility to handle their patients and they agreed upon 3 such slots. *Id.* He added: "In other words that which we could handle and it would provide her the ability to do disease state management." *Id.*(p17:8-10).  Geriatrics took the position its patients were best served by

keeping things the same way they had been done, with Babb using her advance scope and handling DSM as she always had, or if setting up special scheduling or grid practices were necessary it would set up three slots, not the [six] Pharmacy demanded during negotiations. Doc.68-4:51-61. Justice and Wilson have both testified that Pharmacy "would have agreed to three". However, they claimed GPC refused to agree to provide even 3 grid slots for Babb. See Doc.68-3:17(pp.61:1-63:19);Doc.68-2:129(pp.21:9-22:19). In short, pharmacy told Williams that there had to be the larger number of slots they requested [6] or none. *Id.*(p17:20-5). To "justify" this position they claimed that Babb would "loose her credentials" or "the grade". *Id.*(p17:11-18:23). They used this purported concern for Babb to delete any DSM from the Agreement. *Id.* The day after the Agreement was signed Pharmacy management, in an unusual fashion, <u>immediately</u> began to remove her advanced scope even though she was still writing prescriptions. Doc.68-4:67. That evidence can be viewed by a jury as reflecting that pharmacy was not trying to protect Babb because without any DSM under an advanced scope she definitely would lose any ability to advance.

6. Neither the Appellee nor the court explained why a three slot agreement continuing DSM was not executed except for Geriatrics refusal.

7. Pharmacy's version that Williams rejected all DSM had also been

conveyed to Babb. Doc.68-2:7-9¶s12,17. Babb could not understand why Geriatrics was not continuing to do what it had done all along. She felt if she had been involved in the negotiations, she could have convinced Williams not to change Geriatrics' position. *Id.* She even tried to meet with Williams after the 2/12/12 agreement was entered into, along with Hull and a nurse to discuss these matters. Doc.68-2:9¶17. In keeping with his understanding that it was Pharmacy's 6 grid slot way or the highway Williams cut her off. *Id.*;Doc.68-3:42(pp.17:2-18:5). Babb was crestfallen and wrote emails to Pharmacy Management expressing her dismay.

8.    It was not until Williams was deposed in this case that Babb learned that Williams never wanted to change anything and he was willing to go along with Hull's recommendations which included creating 3 special grid slots. See Doc.68-2:9¶17. A jury can infer that Pharmacy demanded a number it knew Geriatrics could not accept and drafted an Agreement it used to take away Babb's advance scope.

9.    The manner and timing of taking away Babb's advanced scope was so unusual that Dr. Robert Stewart, who was the coordinator of advanced scopes, testified that he did not like the wording of an email that said her advance scope was being "cancelled" because he "doesn't know if they're ever

cancelled". Doc.68-3:56-58(pp.27:23-35:14). The email he was referring to is Doc.68-4:63-65 and is dated January 30, 2013. He could not remember this happening with another pharmacist with an advanced scope. Doc.68-3:58(p33); *Id.* Paper work to remove Babb's advance scope began in December (Doc.68-4:67) months <u>before</u> she stopped prescribing. Babb's scope did not expire until October 31, 2013, but it was taken away while she was trying to enter an order for a prescription on the computer on February 15, 2013. Doc.68-2:10¶19. Conversely, Justice who had no need for an advance scope once she was appointed to the associate chief's position in June 2010 did not have it taken away until August 5, 2011 when it was set to expire. Doc.68-2:128-129(pp.20:19-21:8);Doc.68-3:58(p.34-5);Doc.68-2:128(pp.18:17-19:8);Doc.68-3:23-24(pp.88:19-89:11). Compare Doc.68-4:69. According to Stewart this was how other pharmacists with advanced scopes were treated. Doc.68-3:56-58(pp.27:23-35:14).[2]

---

[2] None of the reasons providing for the removal of other advanced scopes even remotely involve Pharmacy changing the active duties of someone using an advanced scope. Doc.52:8-9¶10. This is true for all pharmacists who gave up their advanced scope. Doc.68-3:22-25(pp.82:12-96:10); Doc.68-4:69. No rush to remove is evidenced in Doc.52:8-9¶10. Dr. Paige Kelly (32), a young CPS female had her advance scope reinstated in Geriatrics. Doc.52:9(fn7). Kelly did not work in the GPC, she worked in a different area of Geriatrics. However, the fact that her advance scope was reinstated whereas Babb's was both taken away and never reinstated is evidence that Babb is being treated differently. There

10.    Significantly, before being impeached the Appellee offered litigation declarations, under 28 U.S.C.§1746, from Wilson, Justice and Howard that they had no knowledge of Babb's EEO activity prior to early May 2013. Doc.47-23:9-11.

11.    Unbeknownst to Babb, months before Howard, Stewart, Justice and Wilson were all involved in January 2013 email exchanges tying Babb to "EEO". Doc.68-4:63-64,71-73. In the email stream cancelling Babb's advanced scope, Stewart also tells Justice that Babb is planning to apply for the anti-coagulation position.  Doc.68-4:64. The wording of the remainder of the email stream indicates Justice and Stewart pre-judged her qualifications and Justice brought up the EEO activity.  Doc.68-4:62-65.

12.    Also unbeknownst to Babb, Pharmacy Chief Dr. Gary Wilson and his Associate Chief Dr. Keri Justice testified at an Administrative Investigation Board (AIB) on April 8, 2013. The purpose of the AIB was to address Wilson's desire to have people investigated for behavioral code violations for sending

---

was no reason to remove Babb's advance scope because she had needed it for over 3 years.  The only things that changed were who comprised Pharmacy Management and Pharmacy Management's new decision in the form of a new service agreement to not allow her to perform duties necessitating continuation of her advance scope. There is no reason given to justify the unwillingness of Pharmacy to leave the GPC the same way it had been or to compromise on the six slots it demanded.

what he claimed was a letter allegedly critical of him. Doc.68-4:8. At the time they caused the AIB to be instituted, (March 2013) Wilson and Justice knew Babb believed older females were being discriminated against. When being asked questions designed to help Board members identify people to be investigated, they specifically identified Babb as well as Drs. Truitt and Trask and give a reason. Doc.68-2:141-142(pp.519:24-520:2); Doc.68-2:140-141(pp.508:20-509:24). As to Babb, Wilson testified Doc.68-2:141-142 (pp.519:24-520:2): "But I think that this whole thing between ███ and ███ and Noris [Babb] was that they felt that they were discriminated against over age and sex."[3] Justice testified Doc.68-2:140-141 (pp.508:20-509:24):

> Ms. Justice: But I could—We definitely have a handful of –Paul Laucka used to call them the mow-mows. And I don't even know what that reference is. But the squeaky wheels. There's a handful of pharmacists that are –are never happy, always complaining. If we say the sky is blue, then it isn't. You know, it's – it's just they're perpetually unhappy.
> Mr. Neeley: Can you name a handful if it's –
> Ms. Justice: Yes. ██████████████████████ Noris Babb. That's probably about it.
> Mr. Waldrop: And the folks that you said you had to make a determination based on their clinical education and background, would you categorize those folks that are the people that have come through the residency program that got into these jobs and –or is it a variety, a mix,

---

[3] We received in this case only the testimony that related to Babb and the testimony relating to Truitt and Trask was blacked out, but we already had that testimony with Babb's name blacked out, because it was produced in Truitt and Trask's case. Blackouts refer to Trask and Truitt.

or were there mostly – Is there a young/older issue or any of that issue kind of –

    Ms. Justice: Yeah.

    Mr. Waldrop: -- perceived by the staff?

    Ms. Justice: It's perceived and EEO'd that they are younger. And the older females in particular –which all those I named were females, but of course, 70-some percent of pharmacists are females –that they were discriminated against because they were older and female.[4]

13.    In the present case, Wilson sought to lessen the impact of his testimony but admitted that management had the perception that Babb "was part of a group of people that felt they were being discriminated against on the basis of age and gender" by some time after the beginning of 2013. Doc.68-2:132(pp.33:24-34:22). He also admitted there was probably some perception that Babb would file her own EEO prior to 2013. *Id.*[5]

14.    As the District Court found, on February 8, 2013, Babb told Justice that she felt the discrimination against Trask and Truitt was unfair.

15.    The emails, conversation, AIB testimony of Justice and Wilson and their deposition admissions are available to a jury when deciding if their litigation declarations are true or accurate. Under case law, if the declarations are impeached a reasonable jury can consider that for credibility as well as

---

[4] Again the blackout refers to at least Truitt and Trask. At this time only Truitt and Trask had filed an EEO.

[5] Justice has admitted that management is trained to know EEO activity included testimony and opposing discrimination. See Doc.68-3:3(p6:21-7:10). Their declarations talk about Babb's participation in EEO activity.

when knowledge actually occurred.

16.    In 2011 younger, predominately male pharmacists were given the only <u>advertised</u> PACT CPS positions, (6 out of 34 PACT positions). Doc.68-6:78-80.    Truitt, Trask and another female over 50 occupied 3 of these positions.  The 3 others were new.  Doc.68-6:45-65.  Despite comprising only 13.9% of the clinical pharmacists, younger males received two-thirds of the positions. *Id.*    Younger females who comprise a third of the pharmacists received the remaining third. *Id.* Despite Wilson and Justice's AIB admissions that 70% of the pharmacists were females, those over 40, who represent a plurality, received none of the advertised positions. All of these positions were upgraded to GS-13 positions.   Doc.68-6:82-84.   For years advanced scopes were always given if a single physician signed an application requesting one. Despite the support of the 8 PACT position physicians whose patients would be in PACT and the Chief of Primary Care applications were not accepted for Truitt and Trask.   Doc.68-6:53-65. Babb developed a good faith belief that Trask and Truitt were discriminated against. Doc.68-2:6,13-14¶s9,28-30.

17.    Additionally, no older female pharmacist except two, 8 to 10 years younger than Babb, even the ones with an advanced scope in 2011, received a GS-13 prior to June 1, 2014 after lawsuits were filed. See ¶22 *infra.* However,

all other protected groups (i.e., younger females, younger males and older males had members who received a GS-13 over a year before. Doc.68-6:78-84; ¶22 *infra*. In between Truitt, Trask and Babb filed EEO complaints and incurred significant expense both in fees and costs, and management hostility to move them forward.  A jury can find it was these actions that broke open a multiyear closed door under this new pharmacy administration.

18.    Babb presented evidence that ultimately all of this led to a constructive loss of her GPC position and to unsuccessful efforts to obtain other positions. Doc.68-2:10-11¶21, *et seq*. While Pharmacy would have allowed her to stay in the GPC position, the heart of what she had been doing was removed by <u>Pharmacy</u>. On March 27, 2013 Babb learned she lost a GS-13 promotional opportunity of roughly $7000 per year. Doc.68-2:10¶20.

19.    On April 23, 2013, Babb became aware by email from Wilson that she was not selected for the position of, anticoagulation CPS position discussed in the January 2013 email stream between Justice and Stewart referencing EEO. See ¶9 *supra*; Doc.68-6:89-90.  Wilson claims he relied on a panel scoring. Doc.68-2:127(p13:3-5).   Babb was interviewed by three panel members Stewart, Kim Hall, and Cathy Sypnewski. The email stream discussed in ¶9 *supra* involves the important management people in this selection. Justice made

Stewart the lead of the panel, prepared the questions for the panel, discussed those interested and in the case of Babb, EEO activity. See Doc.68-3:9(p29:3-30:12);Doc.68-3:54-56(p17:2-27:21). Babb argued below that the process was infected with hostility to Babb before her interview.

20.     Despite Appellee's position in *Trask v. Dep't of Veterans Affairs*, 822 F.3d 1179 (11th Cir. 2016) that advance scopes are an "objective requirement" for a PACT CPS position, the selectees were Drs. Sarah Grawe (26) and Amy Mack (30). Grawe had never had an advance scope. Ex6a p49:9-50:8. She was not a CPS and had never independently prescribed medication for DSM. One thing that both Mack and Grawe had was a residency, a key factor in scoring. Doc.68-3:70-71(p21:16-22:11). A score sheet used to rank the applicants favored younger applicants by not valuing years of experience as a pharmacist. Doc.68-6:91-103. Stewart, in Truitt's case, testified that he wanted people who had residency for all the positions. Doc.68-3:70-71(p21:16-22:11). Residencies are recent in pharmacy and he admitted that 99% of people who had residencies were right out of school. Doc.68-3:74-75(p121:15-127:4). In other words, he knowingly had a preference criterion which prejudiced older females in favor of younger pharmacists with PACT positions. Justice's AIB testimony recognized many selections were based on this discriminatory factor.

Doc.68-2:141(p509:5-24). This was in conflict with VACO Guidelines which required the consideration of equivalent experience and specifically cautioned against relying only on residency. Doc.68-6:105-107. A review of the score sheets shows Stewart rating Babb especially low. He and the other 2 panel members gave the selectees 5 points on a residency when scoring the application and again gave significant points to residency when assessing experience. See Doc.68-6:92-103;Doc.68-2:11-13¶23.

21.     Babb was further disadvantaged because she had been denied training for anticoagulation which would have increased the likelihood of her selection. Ex3b p33:7-35:14;Doc.68-2:11¶23. A male, Brian Steele, was given anticoagulation training while not performing those duties. Doc.68-2:11-13¶23. Babb was not promoted to the CPS, anticoagulation that would have brought her higher pay ($7000) and retirement benefits when the position became a GS-13 in 2013. Doc.68-2:11-13¶23;Doc.68-6:82-82. These refusals put her at a disadvantage when she was applying for the position in Spring 2013. Training which will result in a promotion should be granted. Doc.68-6:108-112. All of these denials of training came after she supported Truitt and Trask, and continued after management knew about the Agreement and cancelling of her advanced scope.

22.     There were several women over 50 who like Babb had DSM advance scopes. See Doc.68-4:69.  None of those women had received a GS-13 prior to June 2014 except Cecelia Morelli who received it under a prior administration. Doc.68-2:16-17¶36; Doc.68-6:82-84(shows after 2009). Some female supervisors, (Justice, West) had also received a GS-13. Conversely, numerous young females, young males as well as several older males, Lobley (43 in 2013), Totterdale (45 in 2013), Victor Rozance (56 in 2013) had received GS-13s after 2009. Doc.68-6:82-84. Joseph Justino was over 50 but received his GS-13 from the prior management. Under current management, Ramona Billings received a GS-13 in February 2015. Doc.68-2:16-17¶36;Doc.68-6:89-90. In 2014, while depositions were being scheduled for management officials and others in the Trask and Truitt case, see Doc.68-5:1-55, a GS-13 position was advertised nationally.   See Doc.68-2:13-14¶27. Babb applied for that position and was certified as qualified for the position as had Linda Rolston, an older female, and Tim Ebert, a younger male. Babb was selected for what was supposed to be a GS-13 position as advertised without any interview being done. Justice told her she was simply the best for the job. *Id.*  Ebert was given a position that had been offered to Babb and declined by her. *Id.* That position was ½ PACT in Palm Harbor and ½ anti-coag. Babb was found too

inexperienced for anti-coag in 2013, but was offered an anti-coag position in 2014, even though she had had no additional training or experience. *Id*. Like Trask and Truitt, Billings and Morelli had been removed from inpatient positions and replaced by younger pharmacists in 2011, Peter Pasek (28 in 2011) and Vicki Koenig (28 in 2011). Doc.68-3:120(p213:2-214:17);Doc.68-6:85-87. The younger pharmacists were made GS-13 in 2013 along with the anti-coag as a group. Doc.68-4:49;Doc.68-6:82-84. Two female pharmacists already in the anti-coag group (prior management) at the time Doc.68-4:49 was issued, Kim Hall (then 42) and Danelle Hall (then 44) were also well younger than Babb (then 52). See Doc.68-6:82-84.

23.     Ebert had been a person that Management used as a negative comparator in the Truitt and Trask case (because he wasn't selected) More significantly, they gave another negative comparator, Linda Rolston, a GS-13 effective June 1, 2014 despite the fact she had been in the same position <u>since 1986</u>. See Doc.68-3:80-81(p4:2-5:21):82(p48:4-21). She had held this position for years but not given a GS-13 in March 2013 when the new GS guidelines were announced by Wilson. Babb argued below that a jury should be able to consider whether the ulterior motive was covering up obvious discrimination or retaliation that had been going on against older females including Babb or

Trask and Truitt. The people filing those suits have gone through great expense and suffered adverse actions to try to change things in a protected class which is currently experiencing discrimination. *See* David Neumark et al., *Is It Harder for Older Workers to Find Jobs? New and Improved Evidence from a Field Experiment* (NBER Working Paper No. 21669, Oct. 2015), http://www.nber.org/papers/w21669.

24.     On September 27, 2012, Dr. Babb was denied attendance at a GPC PACT training conference for reasons she disputes, while Marina Sulik, (then 31) was allowed to attend an off campus training conference with her PACT team and other PACT pharmacists were allowed to attend training during this same time period.     Doc.68-2:25-26(p21:1-27:8);Doc.68-2:8¶13.  Hull strongly objected. Doc.68-6:120-124.

25.     In December 2012, Babb received a verbal counseling by Wilson for not having training approved by the Education Department. Doc.68-2:130-131(p27:10-31:6);Doc.68-6:114-118.  Wilson reprimanded her for not having this package approved by the Education Department. Babb sent this package for approval, but Babb was not allowed to teach the class any longer. *Id.* The same material was handed out by two older male counterparts, Dr. Eric Mathos (then 54) and Dr. Victor Rozance (then 55), who had been using the material in their

classes since 1997 without any reprimand. *Id*.

26. Shortly after, Babb opposed discrimination in the February 8, 2013 conversation with Justice. On February 15, 2013 Wilson removed Babb's advanced scope of practice before it was due to expire on October 31, 2013. Doc.68-2:10¶19. On March 27, 2013, Babb became aware that Wilson was excluding Babb from promotions by implementing new qualification standards which helped CPSs with an advanced scope to be promoted to GS-13 which would have brought her a higher salary, pay, compensation and retirement benefits. Doc.68-2:10¶20. She realized at this point the loss was not just Williams, but discrimination or retaliation by Pharmacy. *Id*.

27. On April 24, 2013 Justice denied Babb a lateral move from the geri-PACT to the Mod B PACT. Doc.68-2:10-11¶21. Originally, in June 2012, Howard had "offered" this proposed lateral move to Babb. Doc.68-2:6-7¶10. Initially, Babb turned down this move because she had planned on continuing to work in the GPC *Id*. After Truitt and Trask's ROIs were sent to the Agency, the GPC position changed and the anti-coag position was denied as discussed above. Babb therefore reconsidered and wanted to accept the lateral move. However, Justice testified no position had ever existed in 2012, (Doc.68-3:2-36(p67:23-68:23) and informed Babb that she could not move anyone into a

position without advertising. Doc.68-2:10-11¶21. A male over 40 was moved into a PACT position without it being advertised. Doc.68-2:14-15¶29.

28.     Babb was given a GS-13 position in March 2014. Doc.68-2:13-14¶27. However, she was not actually promoted to a GS-13 until July 28, 2014. Doc.68-7:25-27. She agreed to a work schedule involving 9 hours Tuesday through Friday and 4 hours on Saturday. Doc.68-2:13-14¶27. At the time she took the job she did not know management would use the schedule to deny her excused holiday time. *Id*. She asked for this to be addressed fairly so she would receive her entire excused holiday pay, but that was denied. *Id.* This violates federal statutes.   See fn p.37. Doc.46 contains facts and relevant documents summarized on pages 7-8 and 11-15. Doc.46:7-8. A social worker with the same schedule gets 8 hours of excused time. Doc.68-3:106.  It cost Babb $2320 as of the MSJ.  Doc.68-2:16¶34.

29.     There was a "no harm no foul" argument asserted below that even if Babb kept her advance scope, she could not have received a GS-13 because 25% of her time was not spent providing prescription services relating to disease state management. Doc.52:8-9¶10; Doc.52-2:3-4¶11. Babb heavily disputed the Appellee's time calculations.  On February 6, 2013, discussing her disappointment about being told about a future revocation of her advanced

scope of practice, Babb stated "so no promotion for me." Howard replied "there never was." Doc.68-2:90-91(p.90:22-93:7);Doc.68-2:9-10¶18. Howard informed Babb that she could not have been promoted to GS-13, because Babb did not get the number of patients required in her clinic and that Babb needed to have 25% of her time spent seeing patients. *Id.* Babb disagreed. *Id.* Moreover, Babb told management she could make 25% with 3 slots in September 2012. Doc.68-2:89(p85:6-86:15).

30. During discovery, Appellee produced the documents Howard claimed she relied upon and they reflected that Babb was exceeding 25%. Doc.68-2:72-73(p19:17-21:13). Had Babb been allowed to continue practicing the way she had been practicing in GPC, management would not have been able to show she did not meet the 25%. *Id.*(p80:22-91:22). She was seeing patients both by appointment and by telephone contact. *Id.*(p20:5-9)

31. Remarkably after Babb attacked Howard's claim based on the documents Howard claimed to use, Management produced new documents and selectively calculated another way to claim Babb had not met the 25%. Doc.52-2:3-4¶11 to MSJ (and scores of post discovery documents listed therein). However, Babb's affidavit Doc.68-2:16¶34 and Doc.68-7:17-22 identify errors in their second effort to reduce her percentage. These included counting days

she was not in the clinic or days it was not opened, as well as methods of calculating time spent on medications which are inconsistent with the methods in use. *Id*. Properly calculated she was at 27%. Doc.68-7:17-22.

32.     In Appellee's Reply brief, Justice, whose veracity is already at issue Doc.70-1:2-5¶7**,** admitted mistakes in her first (the Agency's second) 25% calculation, but made a new (third) statement against the 25%. Doc.70-1:4-5¶7. Babb provided evidence that this new (third) statement is also wrong. Doc.74-1:1-3¶s1,2. This is a disputed fact.

33.     In fact, Babb argued below that all of this is selective. Pharmacy admitted the vast majority of the males and younger females who were submitted for GS-13 upgrades did not meet the 25%. Doc.68-7:4-7. There were 43 CPS upgrades including PACT and anti-coagulation. *Id.* It found a way to upgrade them, but similar action was not given to Babb.

34.     Pharmacy also found ways to help young females who could never meet the 25% by giving them responsibilities it would not consider for Babb as discussed in above. Doc.68-2:11-13¶s18,23;Doc.68-3:108-110(p4:14-6:21;p10-10:19).

## STATEMENT OF THE STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is only

appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *King v. Butts Cnty., Ga.*, 576 Fed. App'x 923, 928 (11th Cir. 2014). The substantive law applicable to the case determines which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the burden of proving that no genuine issue of material fact exists." *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). Once the moving party has met this burden, the non-movant must then show a genuine dispute regarding any issue for which it will bear the burden of proof at trial. *Id.* at 1224-25. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. The judge may not make credibility determinations at this stage. *King*, 576 Fed. App'x at 928. In evaluating the movant's motion for summary judgment, "the district court must

view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor." *Info. Sys. & Networks Corp.*, 281 F.3d at 1224.

## SUMMARY OF ARGUMENT

The Appellee's Motion for Summary Judgment was based solely on an analysis under *McDonnell Douglas, Inc. v. Green,* 411 U.S. 792 (1973). It overlooked an analysis of all the circumstantial evidence relevant to discriminatory intent. It also eschewed any discussion of whether discrimination or retaliation was a motivating factor for any of its actions.

The District Court found the Appellant satisfied the *prima facie* case for retaliation but could not show pretext for adverse actions. It overlooked the fact Williams and Hull testified against management's pretextual reason on the triggering issue of loss of Babb's advanced scope. It also overlooked evidence allowing a jury to find Justice and Wilson's declarations were untrue, as well as AIB testimony and emails evidencing hostility to her EEO activity. The pretext discussion also neglected to point out that it allowed management to make decisions regarding to holiday pay despite the fact that those decisions violated federal statutes.

The Appellant argued under *Quigg v. Thomas Cnty. Sch. Dist.,* 814 F.3d 1227 (11th Cir. 2016) that all the circumstantial evidence should be considered in determining whether or not gender plus age was a motivating factor in management's decisions. The court's decision did not mention *Quigg* and its analysis did not include it. In fact, the court cropped its analysis by only considering the *McDonnell Douglas* standard. While the court's analysis of pretext overlooked testimony directly contradicting the pretextual reason offered by management, the greater failure was not considering this along with the other circumstantial evidence presented by the Appellant to show discriminatory intent and which also provided circumstantial evidence helping to show pretext. The court did conclusorily state, without any analysis of the evidence, that the Appellant had failed to show a convincing mosaic of circumstantial evidence under *Smith v. Lockheed Martin Corp.,* 644 F.3d 1321, 1328 (11th Cir. 2011). The only evidence the court mentions is the evidence that was offered in *Smith,* not the evidence that the Appellant offered in this case. The court's analysis of discrete acts also failed to consider several of the discrete acts the Appellant maintained were caused by the Appellee's gender plus discrimination. Some of those acts were addressed in its discussion of retaliation.

The Appellant also raised the need for the court to consider whether discrimination or retaliation was a motivating factor given the language of 42 U.S.C. § 2000e-16 ("All personnel actions affecting employees or applicants for employees . . . in executive agencies as defined in section 105 of Title V. . . shall remain free from any discrimination based on race, color, religion, sex or national origin."), as well under 29 U.S.C. § 633a ("All personnel actions affecting employees or applicants for employees who are at least forty years of age in executive agencies as defined in section 105 of Title V shall remain free from any discrimination based on age.") The Supreme Court has held that the "free from" language is a broad prohibition against discrimination, which includes a prohibition of retaliation. *See Gomez-Perez v. Potter*, 553 U.S. 474, 485-91 (2008).

In an age discrimination case, the District of Columbia Circuit has recognized that Congress deliberately prescribed a distinct statutory scheme applicable only to federal employees using "sweeping language". *Ford v. Mabus,* 629 F.3d 198 (D.C. Cir. 2010). The Equal Employment Opportunity Commission has issued Enforcement Guidance explaining that the "free from" language requires that an adverse action not be motivated by discrimination or retaliation. EEOC Enforcement Guidance on Retaliation and Related Issues,

28

No. 915.004, 2016 WL 4688886 (Aug. 25, 2016). Similarly, the Merit Systems Protection Board which resolves many federal employee discrimination claims that come up as part of direct appeals, has reached the same result. *See Savage v. Dep't of Army*, 122 M.S.P.R. 612, 633-35 (Sept. 3, 2015).

The District Court committed reversible error by failing to consider the motivating factor standard. *See Taylor v. Peerless Indus., Inc.*, 211 Fed. App'x 248, 250 (5th Cir. 2006). The District Court's analysis under *McDonnell Douglas* is also erroneous because it disregarded evidence presented by the non-movant and failed to draw inferences in the non-movant's favor.

Finally, the Appellee invited the District Court to apply a "slap you in the face" non-selection test despite the Supreme Court's rejection of the use of that test. *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456-57 (2006). Despite the fact that this District Court was advised of the Supreme Court's holding in *Ash*, it went on to apply that test anyway.

## ARGUMENT

**I. THE DISTRICT COURT ERRED IN DECIDING THERE WERE NO DISPUTED ISSUES OF MATERIAL FACT PRESENTING A TRIABLE ISSUE ON RETALIATION.**

The District Court found that Appellant established a *prima facie* case of retaliation. Doc.83:20-5. Such evidence is circumstantial evidence of both

discriminatory intent and pretext. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255-56 and n.10 (1981). However, the court ruled that the claims failed to overcome management's proffered reasons. In doing so it bypassed other significant circumstantial evidence of both retaliatory intent and pretext.

The cancellation of Babb's advanced scope was a triggering event leading to subsequent actions including: her loss of a GS-13 position; her leaving the GPC position she highly valued; her applications and rejections for other positions; and her being placed in a position where she was forced to accept holiday pay on a basis which violated the law. The District Court accepted management's pretextual claim that Williams did not want Babb to perform DSM , therefore, Babb had no need for an advanced scope. That finding usurps the jury's role. Williams and Hull testified they were not against Babb doing DSM, just the number of daily slots that pharmacy was demanding be set aside for DSM. Williams testified that Geriatrics wanted GPC to operate as it had with Babb doing DSM. ¶5 *supra*. Williams also testified he was even willing to agree to 3 DSM grid slots. *Id.* Pharmacy management in essence said that was unworkable because it would be harmful to Babb! This testimony destroys the assertion that Geriatrics did not want DSM creating a jury question on this issue. Second, Pharmacy's alleged desire to protect Babb is a disputed

fact. She was not allowed to be in Agreement negotiations and she told pharmacy management she could make 25% with 3 slots. ¶s29,30 *supra*. The desire to help Babb also conflicts with the failure to agree to 3 slots. Justice and Wilson could not think of any reason to reject 3 slots and they testified they would have agreed to 3. ¶5 *supra*. They claimed it did not happen because Williams did not want that. *Id.* However, Williams and Hull said they wanted 3 slots. *Id.* The Agreement had to have no DSM for only one reason –to remove Babb's advanced scope. It was about punishing her as their actions showed when they <u>immediately</u> removed her advance scope after execution of the Agreement. Doc.68-4:67. Stewart who is a coordinator regarding advance scopes said he had never before seen what happened to Babb. ¶9 *supra.* Her scope was removed 8 months before it was set to expire on October 31, 2013. ¶9 *supra*. A jury can find that this unprecedented rush by Pharmacy Management evidences an animus.

If management wants to claim Babb arguably would have been hurt if she kept her advanced scope with 3 slots because she would not meet a 25% DSM needed for a GS-13, it would still have to recognize taking away her advanced scope guarantees she could not become a GS-13. She only needs an advanced scope if she is doing DSM. Conversely, if she did not lose her advanced scope

31

management would need to confront the actual numbers concerning whether Babb was doing 25% to stop her from receiving a GS-13.[6]  Babb always knew she was meeting the 25%.  When Howard brought it up in February 2013, she disagreed.  When she received management's statistics in this case, she refuted them.  They were so wrong management produced post-discovery documents and 2 new versions of why Babb did not meet the 25%.  Each is demonstrably wrong.  Before anyone finds what was secretly done without Babb in the fall of 2012 was to help her, they have to unfairly resolve several material disputed facts in management's favor.

There are jury questions on pretext in regard to the removal of Appellant's advanced scope and the denial of her promotion.  The court never addressed this evidence head on.

Moreover, both Wilson and Justice, who provided management's defense to retaliation, had other very material credibility issues.  They filed declarations to assist litigation efforts and falsely stated they did not know of Appellant's participation in EEO activity until after she filed her informal complaint in May 2013.  In their depositions they were impeached with AIB testimony which not only showed that they believed she was involved in EEO activity, but identified

---

[6]It would also have had to confront the fact that others who apparently did not meet 25% kept their scopes and got GS-13s. Doc.68-7:4-7.

that as being opposition to discrimination against older females. ¶12 *supra.*
This testimony occurred over a month before they claimed to have any
knowledge of EEO activity. Justice had a conversation with Appellant that
related to opposition to discrimination on February 8, 2013, three months before
Justicce claimed to have knowledge of Appellant's participation in EEO
activity. Please note Justice admitted that managers are trained to know that
opposition to discrimination is participation in EEO activity. ¶13fn5 *supra.*
Justice also told Wilson about her conversation with Appellant so he had this
information 3 months before his declaration. Doc.68-2:131-2(p32:17-33:19).
However, that doesn't even end their conduct. At the beginning and end of
January 2013, Justice, Stewart, Howard and Wilson were involved in sending
emails which made reference to Babb's EEO activity. ¶1 *supra.* The EEO
activity that Appellant had taken as of January 2013 included her statements
and testimony she gave in Trask and Truitt cases. ¶3 *supra.* Those statements
were made in April and May 2012, and sent to the VA in the summer.
Management and Babb's involvement in that case continued on into the fall of
2012 (and after) in advance of all the other alleged retaliatory actions.
*Id.*;Doc.68-1:8-9¶s11-13.

When someone falsely states or is impeached as to when they had

knowledge of the EEO activity of an employee alleging retaliation, a jury must be allowed to consider that evidence in determining whether or not they were actually aware of the EEO activity at an earlier point in time. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163-64 (11th Cir. 1993). It also goes to credibility. *Id*. at n.12. A jury can find that the false reason (Geriatrics made us do it) coupled with the false testimony about EEO knowledge goes to the credibility of management and the jury should be entitled to consider that when assessing any of the alleged legitimate reasons management has given in this case.

As with the gender plus age discrimination discussion below, the court's *McDonnell Douglas* analysis only looked at the *prima facie* case and pretext and it missed other key evidence of retaliatory intent. The April 2013 testimony provided during an AIB not only impeaches the declarations of Justice and Wilson, it is evidence of hostility to Appellant's opposition to discrimination against older females. Wilson and Justice testified before an AIB empaneled in March 2013 to address a letter which he felt was critical of him. They testified on April 8, 2013 to help the Board identify people who should be targeted for investigation. Doc.68-2:118-120(p519:24-520:2); Doc.68-2:138-140(p508:20-509:24). He identified Babb, Trask and Truitt by saying ". . . I think that this whole thing between [Trask] and [Truitt] and Noris

[Babb] was that they felt that they were discriminated against over age and sex." Justice also identified Truitt, Trask and Babb. Doc.68-2:138-140(p.508:20-509:24). Justice testified that it is "perceived by staff that there is a young/older issue going on in pharmacy." She said "[I]t's perceived and EEO'd that they are younger. And the older females in particular- which all of those I named were females, but of course some 70% of pharmacists are females- that they were discriminated against because they were older and female." *Id.* [7]

The court also did not address this evidence or the fact that there were emails sent by and between Wilson, Justice, Stewart and Howard which referenced Appellant's EEO activity. Doc.68-4:62-65; Doc.68-4:71. At the very least this is circumstantial evidence of retaliatory animus for what Justice admitted was EEO activity. However, circumstantial evidence of discriminatory or retaliatory intent can and should be considered, *inter alia,* on the issue of pretext. *See Burdine*, 450 U.S. at 255-56 and n.10.

Moreover, the testimony by both Justice and Wilson at the AIB allows a jury to find discriminatory or retaliatory intent against Babb because she is one

---

[7]Despite conducting 31 interviews, the AIB found no evidence of their involvement with the letter. Doc.68-4:8-13(p10-13¶2A1.a and C).

of the female pharmacists opposing discrimination against older females. In *Merritt v. Dillard Paper Co.,*120 F.3d 1181,1189 (11th Cir. 1997), the Eleventh Circuit stated that "[i]n a long line of cases, [the Eleventh Circuit] has found direct evidence where 'actions, or statements of an employer reflect [ ] a discriminatory or retaliatory attitude corresponding to the discrimination or retaliation complained of by the employee.'" In *E.E.O.C. v. Beverage Canners, Inc.,* 897 F.2d 1067, 1071 (11th Cir. 1990), the Eleventh Circuit noted that "[d]iscriminatory motive may be proved by direct evidence of the hiring authority's racially discriminatory attitudes, regardless of whether it relates to the employment decision at issue."  Similarly, evidence of targeting of an employee has been held to be direct evidence.  *See, e.g., Lee v. Russell County Bd. Of Educ.,* 689 F.2d 769, 775 (11th Cir. 1982). In any event, it is circumstantial evidence of intent.  *See Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998) ("Language not amounting to direct evidence, but showing some [discriminatory] animus, may be significant evidence of pretext once a plaintiff has set out the prima facie case."); *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1362-63 (11th Cir. 1999) (finding a comment evincing the state of mind of the decision-maker at the time of the challenged action to be a "significant piece of circumstantial evidence,"

given the substance, context, and timing). It is also circumstantial evidence for a mixed motive. *See Quigg,* (discussed *infra*, in Section II).

While the conversation with Justice in February 2013 can explain animosity after that point such as the AIB testimony, even earlier animus and actions as well as false statements can support a jury finding that another basis was the statements given in the Truitt and Trask case in April and May 2012. Doc.68-4:87-109; Doc.68-6:45-65. Those statements were contained in two ROIs sent to the VA in June 2012.

On March 27, 2013 Wilson announced that pharmacists with an advance scope of practice could be promoted to GS-13. Babb had just recently been disqualified. This was followed by a 2013 denial of an anti-coag position for a lack of experience that did not matter in 2014. Additional denials occurred in 2013. Finally, Babb received a position in 2014. Despite the fact she was selected for a position advertised as a GS-13, she was told she needed post selection training. Five months later, she was given the GS-13 without the training. Doc.68-2:13-14¶27. That year cost her roughly $7000, attorney's fees and more retaliatory animus. Doc.68-2:16¶33. She was also denied the

appropriate holiday pay[8] as set forth in ¶28 *supra*; Doc.68-2:13-14¶27. Roughly $2,320. Doc.68-2:16¶34. All of this is actionable under the Lilli Ledbetter Act. *See* 42 U.S.C. §§ 2000e-5(e)(3), 2000e-16(f); 29 U.S.C. §§ 626(d)(3), 633a(f).

Appellee's MSJ also admitted that management "may have" anticipated Appellant's EEO activity as early as January 2013. Doc.52:22. This misstates the AIB testimony and admissions discussed above which a jury can find reflected actual knowledge. However, it is submitted the Appellee has admitted it perceived she was involved in EEO activity including that this probably went back to 2012. ¶s12,13 *supra*. While the Eleventh Circuit has apparently not considered this "anticipation" or "perception" theory of retaliation, other courts have. *See, e.g., Fogelman v. Mercy Hosp.*, 283 F.3d 561, 571-72 (3d Cir. 2002) (recognizing that a plaintiff may proceed with a discrimination claim on the basis that the Appellee perceived him as engaging in protected activity). Recently, the Supreme Court addressed a similar issue regarding Section 1983,

---

[8] Employees are entitled to 8 hours of holiday pay on a designated holiday, unless they are on a compressed schedule. *See* 5 U.S.C. § 6124 (entitling flexible-schedule employees to 8 hours of holiday pay); 5 U.S.C. § 6103 (entitling traditional-fixed-work-schedule employees to an ordinary day's work of holiday pay – 8 hours under § 6101(a)(3)). Babb could not have been on a compressed schedule, because she had an 80-hour biweekly basic work requirement scheduled over 10 workdays. *See* 5 U.S.C. § 6121(5)(A).

the federal statute providing a cause of action for damages for constitutional violations by state and local governments and officials. *See Heffernan v. City of Paterson*, 136 S. Ct. 1412, 1418-19 (2016). The question presented was whether a demotion was unconstitutional retaliation when the demotion was based upon an erroneous belief or perception about what the employee was doing. The majority concluded that it was the employer's reasons—the motivation and the facts as the employer reasonably understood them—that matter. Like the plaintiff in *Heffernan*, in the light most favorable to Babb, the facts allow an inference that at a minimum, Babb was retaliated against as a result of an employer's admitted perception of the facts. The Supreme Court found that such conduct would discourage a plaintiff, and his colleagues, from even appearing to engage in such conduct in the future. *Id.* at 1419. The anti-retaliation statutes were written specifically to prevent employer interference with "unfettered access" to the remedial mechanisms of the discrimination statutes by prohibiting employer actions likely to deter discrimination victims from complaining to the EEOC, the courts, and employers. *See Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Here, Wilson admits that management perceived EEO activity by the beginning of 2013 and "probably earlier." If so this case is an even stronger case than *Heffernan* because there

was no mistaken belief as to the Truitt and Trask case. As to her own potential claim Babb is like the *Heffernan* plaintiff, because Babb did not determine she had a real claim until March 27, 2013. As such, Babb should be protected from retaliation because of a perception of EEO activity just as if the employer actually knew of protected activity. Moreover, as discussed above a reasonable jury can find management had actual knowledge.

The court's decision should be reversed.

**II.**   **THE DISTRICT COURT'S ORDER SHOULD BE REVERSED FOR FAILING TO ALLOW APPELLANT TO PROVE DISCRIMINATION AND RETALIATION CLAIMS UNDER A MOTIVATING FACTOR TEST UNDER QUIGG, 42 U.S.C. § 2000e-2(m); 29 U.S.C. §633a OR 42 U.S.C. §2000e-16.**

Regarding Appellant's gender plus discrimination claims, the Secretary asserted and the District Court agreed that Appellant should prove her case under the *McDonnell-Douglas* framework. Doc.83:37-8. This is an incorrect statement of law as it only allows one of the alternative standards applicable in this case. As discussed below, the *McDonnell-Douglas* framework is no longer sufficient for a complete analysis of Appellant's claims. *See Quigg*. As the Secretary's Motion does not address Appellant's claims outside of the *McDonnell-Douglas* framework, he did not meet his burden of proving an absence of evidence in support of Appellant's case. The Secretary's Motion

should have been denied for this reason alone.  It was not.  The District Court's

decision should be reversed on this basis.  *See Taylor, supra*,  211 Fed. App. at

250.

### A. The District Court Erred By Failing To Apply Quigg To The Appellant's Mixed-Motive Discrimination Claims

"An employee can succeed on a mixed-motive claim by showing that

illegal bias, such as bias based on sex or gender, 'was a motivating factor for'

an adverse employment action, 'even though other factors also motivated' the

action."  *Quigg*, 814 F.3d at 1235.  However, an employee need not plead a

"mixed-motives" claim, as opposed to a "pretext" or "single-motive" claim, in

order to require a mixed-motive analysis.  *See Price Waterhouse v. Hopkins*,

490 U.S. 228, 247 n.12 (1989) (explaining that a plaintiff should not be required

to label her complaint as either a "pretext" case or a "mixed-motives" case from

the beginning in the District Court because "[d]iscovery often [is[ necessary

before [she] can know whether both legitimate and illegitimate considerations

played a part in the decision against her"); *E.E.O.C. v. TBC Corp.*, 532 Fed.

App'x 901, 902 (11th Cir. 2013) (finding that a plaintiff had only to argue that

the case involved mixed motives at some point in the proceedings).  This is

because they are theories that serve as alternative causation standards for

proving discrimination, as opposed to distinct causes of action.  *Quigg*, 814

F.3d at 1235 n.4. No longer needing direct evidence to establish a mixed-motives claim under Title VII, a plaintiff may establish her claim through circumstantial evidence showing that unlawful discrimination was a motivating factor in the adverse employment decision. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003); *see also Quigg*, 814 F.3d at 1237 ("In *Desert Palace*, the Supreme Court rejected Justice O'Connor's *Price Waterhouse* 'direct evidence' requirement and held that an employee can prove a mixed-motive case with direct or circumstantial evidence.").

Under this framework, a Appellee moving for summary judgment bears the burden of proving that the circumstantial evidence of the case fails to raise a jury question about whether a discriminatory motive was a motivating factor for the adverse decision. Emphasizing that a plaintiff's circumstantial evidence cannot prove pretext is no longer enough. On the other hand, "to survive a Appellee's motion for summary judgment, a plaintiff asserting a mixed-motive claim need only produce evidence sufficient to convince a jury that: (1) the Appellee took an adverse employment action against the appellant; and (2) a protected characteristic was *a* motivating factor for the Appellee's adverse employment action." *Quigg*, 814 F.3d at 1239; *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008) (describing the framework later

explicitly adopted by the Eleventh Circuit in *Quigg*). "This burden of producing some evidence in support of a mixed-motive claim is not onerous and should preclude sending the case to the jury <u>only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim.</u>" *White*, 533 F.3d at 400 (emphasis added). "As inquiries regarding what actually motivated an employer's decision are very fact intensive, such issues will generally be difficult to determine at the summary judgment stage and thus will typically require sending the case to the jury." *Id.* at 401.[9]

### B. The District Court Erred By Failing To Consider Age Discrimination Or Retaliation Was A Motivating Factor In Actions Taken Against Appellant

The Supreme Court has held that Section 623 of the ADEA creates but-for test for age discrimination claims of private-sector employees. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 173-80 (2009). In *Gross*, the Court distinguished *Price Waterhouse*, which held that the "because of" language of Title VII permitted mixed-motive claims. *Id.* at 173-75. Although Section 623

---

[9] It should be noted that the Secretary was aware of the applicability of the mixed-motives framework and the motivating-factor standard to this case at the time it answered Plaintiff's Complaint—he asserted a same-decision defense as his Seventh Affirmative Defense. Doc.33:11. This is key because the same-decision defense is only relevant in mixed-motives cases. *See* 42 U.S.C. § 2000e-5(g)(2)(B).

ADEA included identical "because of" language interpreted in *Price Waterhouse*, the Court held that Congress made a clear, deliberate choice to permit mixed-motive claims under Title VII but not Section 623 when it codified *Price-Waterhouse's* motivating-factor test for Title VII but not for the ADEA. *Id.* Having distinguished *Price Waterhouse*, Justice Thomas focused on the ordinary meaning of "because of" as being "solely because of," citing dictionary definitions and cases interpreting unrelated statutes. The Court first considered the standard of causation imposed by the text of Section 623 and pointed out that Section 623 prohibits personnel decisions made "because of" a person's age and explained that the "ordinary meaning of . . . 'because of' is that age was the 'reason' that the employer decided to act. *Id.* at 175-77. Therefore, the Court held that Section 623 requires that "a plaintiff must prove that age was the but-for cause of the employer's adverse decision." *Id.* The Court then explained that "[w]here the statutory text is silent on the allocation of the burden of persuasion, we begin with the ordinary default rule that the plaintiffs bear the risk of failing to prove their claims." *Id* at 177. Nothing in Section 623's language, the Court concluded, gave "warrant to depart from the general rule in this setting." *Id.*

With regard to Federal employees, however, Section 623 does not apply.

Rather, Section 633a applies. *See* 29 U.S.C. § 633a. That statute has different language. According to *Gross*, such language must be the focus of the inquiry to determine the standard of causation. *See Gross*, 557 U.S. at 175. Section 633a provides that "[a]ll personnel actions . . . shall be made free from any discrimination based on age." 29 U.S.C. § 633a. The phrase "because of" does not appear in that section. *See id.* As recognized by the D.C. Circuit in, the more sweeping language of Section 633a requires a different interpretation than Section 623—a federal-employee plaintiff merely has the burden to show that age was *a* factor in the challenged personnel action. *Ford v. Mabus*, 629 F.3d 198, 206-07 (D.C. Cir. 2010) (discussing case-law interpretations of similar language along with the fact that Congress deliberately prescribed a distinct statutory scheme applicable only to Federal employees using "sweeping language"); *see also Wingate v. U.S. Postal Serv.*, 118 M.S.P.R. 566 (2012) (concluding that a Federal employee may prove age discrimination by showing that age was 'a factor" in the personnel action, even if it was not the "but for" cause); *Petitioner v. Dep't of Interior*, EEOC DOC 0320110050, 2014 WL 3788011, at \*10 n.6 (July 16, 2014) (holding that the "but-for" standard does not apply in federal sector Title VII or ADEA cases).

Similar to the statutory language discussed above regarding federal-

sector ADEA claims, the statutory language prescribing the standard of causation applicable to Federal employees in retaliation cases is different from the language applicable to private-sector employees. The Supreme Court in *Univ. of Tex. SW Med. Ctr. v. Nassar*, 133 S.Ct. 2517 (2013) extended the rationale of *Gross* to private-sector retaliation claims under Section 2000e-3(a) of Title VII, primarily due to the "because of" language in that section. 133 S.Ct. 2544-46 ("extending the rationale of *Gross*, "[g]iven the lack of any meaningful textual difference between § 2000e-3(a) and § 623(a)(1)") ; 42 U.S.C. § 2000e-3(a). However, "EEO retaliation claims in the Federal sector do not implicate the statute at issue in *Nassar*." *Savage*, 122 M.S.P.R. at 633. Rather, the statute applicable here, like the statute above regarding federal-sector ADEA claims, requires that personnel actions by agencies "be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16. Given this sweeping language, a federal employee should be able to establish a retaliation claim under Section 2000e-16 if a prohibited consideration was a motivating factor in the contested personnel action, even if it was not the only reason. *See Savage*, 122 M.S.P.R. at 634 *Complainant v. Dep't of Homeland Sec.*, EEOC DOC 0720140014, 2015 WL 5042782, at *5-6 (Aug. 19, 2015) (retaliation under Title VII or ADEA);

*Complainant v. Dep't of Homeland Sec.*, EEOC DOC 0720140037, 2015 WL 3542586, at *4-5 (May 29, 2015) (retaliation under Title VII).

## III. THE DISTRICT COURT SHOULD BE REVERSED BECAUSE THE EVIDENCE WAS SUFFICIENT TO RAISE A JURY QUESTION OF WHETHER DISCRIMINATION OR RETALIATION OR BOTH WAS A MOTIVATING FACTOR FOR THOSE ACTIONS

The District Court found that Appellant suffered adverse actions both under its retaliation Doc.83:21-22 and gender plus claims Doc.83:38. It failed to consider whether or not Appellant presented evidence that a protected characteristic was a motivating factor for the Appellee's adverse employment actions. It never discussed or considered its obligations under *Quigg*. Rather the District Court focused on the *McDonnell Douglas* analysis whether Appellant had established a *prima facie* case for retaliation and discrimination, and whether Appellant established that management's reasons were pretextual.

It also found that she it did not establish a *prima facie* case for at least one of the limited actions it asserted were gender plus discrimination, because Appellant's evidence lacked an identifiable comparator. It also found that Appellant's evidence failed to establish pretext. By analyzing Appellant's case in this fashion, the District Court overlooked the vast majority of Appellant's

circumstantial evidence establishing discriminatory intent was a motivating factor for adverse actions and hostile work environment.

## A. Gender Plus Claims

In discussing Appellant's gender plus age claim the court maintains, *inter alia*, that Appellant "maintains that she was discriminated against on the basis of her gender and her age when she was not selected for the anti-coagulation position and when she was denied transfer to Module B." Doc.83:38. This statement overlooks the discussions on Doc.68:27-28 where numerous adverse actions not addressed by the court are set forth, the fact that no older female was given a GS-13 rating until over a year after younger males and females and older males were given such a grade. That page cites ¶22 of Doc.68 which set forth those issues. The discussion on pp.27-28 also makes clear that Appellant's claims include that: her advanced scope was taken away and she lost or was denied a GS-13 promotion; when she challenged a performance appraisal she was reprimanded for using education material two older male counterparts had used for years without reprimand. She had then had it approved but her education duties were removed. When one looks to the facts set forth in the initial portion of the Response and in particular under the heading of "Events Reflecting Reprisal and Gender and Age Discrimination"

one will see repeated discussion of how older females were treated differently than younger males, younger females and older males in a variety of ways since 2011. In fact, it was not until two complaints for discrimination were filed and were proceeding to deposition and summary judgment that the first older female received a GS-13(2014) which all other groups of pharmacists received over a year before. Those other pharmacists included younger males and females and older males. ¶22 *supra*.

The court's analysis is flawed by failing to consider many adverse actions (including actions which were found adverse when the court considered retaliation). More importantly for present purposes, however, it is instructive to review the court's discussion of comparators on page 43 of the Order where the court states:

> It is not an easy task to ascertain the identity of Dr. Babb's purported comparator. In her Response to the Motion for Summary Judgment, she indicates "there are comparators for all of the events. In some instances those comparators are young females; in others young males; in others older males and in still others a combination of all three or two of those categories. However, in each instance older females are being treated adversely." (Doc.68:27)

By using *McDonnell Douglas* the court failed to consider important evidence circumstantially showing that gender plus age discrimination motivated the decisions of Pharmacy's new management for over three years

while older females lost positions, pay increases, and suffered other adverse actions. To be sure, the things that were suffered by Appellant also reflect retaliatory intent. In testimony given by Wilson and Justice to the AIB investigating inappropriate behavior, the specific factor which tied Appellant, Truitt and Trask together as targets was the fact that they were older females who believed that older females were being discriminated against. This remarkable testimony of intent was given when no evidence of their involvement in the letter existed or was found by the AIB. Doc.68-4. While this testimony allows at least a circumstantial evidence inference that retaliation was a primary reason, it also provides circumstantial evidence of gender plus age motivation.

Appellant provided documents and sworn affidavits that when 43 pharmacists were made Clinical Pharmacy Specialists at the GS-13 level in 2013, none of those pharmacists was a female over 50. Doc.68-7:4-7;¶22 *supra*.[10] This evidence included that Appellant was the only pharmacist to have her advanced scope removed when she still had a need for it and was prescribing with it. ¶9 *supra*. Appellant was the only pharmacist to have her advanced scope <u>immediately</u> cancelled because of actions taken by pharmacy

---

[10] Older females are the plurality when one considers the four sex and age groups. *See* Justice AIB testimony. Doc.68-2:141(lines 18-24).

management.  *Id.* No older female received a GS-13 raise until lawsuits were filed by several older female pharmacists and were being presented in federal court.  ¶s22,23 *supra. At* that point, several pharmacists, including Dr. Babb, were finally provided with GS-13 grades. *Id.* These included older female pharmacists who were occupying positions which they had held for years but who were passed over for GS-13s when younger males and females and older males were promoted to GS-13 over a year before.  Appellant was reprimanded for using education materials 2 older males used for years without reprimand.

Appellant's evidence also included evidence in the form of documents and affidavits which might be described as "me too" evidence under *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1285-87 (11th Cir. 2008)  Evidence showed beginning in 2011 pharmacy management engaged in a consistent pattern of denying older females important duties, responsibilities and opportunities that were given to older males, younger males and younger females.  These included removing five older females from positions that would become PACT positions and ultimately as GS-13 position entitling the occupant to $7,000 more per year.  Denying older females applications for advanced scopes, 2011, which had never been done before in the history of Bay Pines when one physician requested they have it in order to treat his or her patients.  It

was done to two older females in 2011 despite the fact that as many as 8 such physicians supported their applications. The lack of an advanced scope was then used as a reason to deny these doctors a position.[11]

The court overlooked evidence that a residency requirement advocated by Dr. Stewart who led the panel for selecting an anti-coagulation position was utilized despite his admitted knowledge that this favored young, under 40 pharmacists. That same requirement also violated VACO directives. Doc.68-6:105-107. The District Court further overlooked the fact that the rating of candidates may have changed had residency not been overly important in both the application and interview process. At least there was a question of fact related to that. When considering pretext, the court also overlooked the email stream which showed her application was prejudged months before and referred

---

[11] See *Trask v. Dep't of Veterans Affairs*, 822 F.3d 1179 (11th Cir. 2016) (Petition for Cert. pending). The decision was repeatedly cited by the District Court in the present case to infer a lack of discrimination against older females. It did so despite the fact that case did not involve either Dr. Babb or the issues she raised in this case and therefore should have no legally binding effect on this case. *See U.S. v. Jones*, 29 F.3d 1549, 1553-54 (11th Cir. 1994). Interestingly, however, the Eleventh Circuit found that an advance scope is necessary at Bay Pines in order to have a PACT CPS position. However, in the instant case it did not consider that portion of the decision when analyzing the fact that Dr. Babb had her advanced scope removed from her when she was in a geri-PACT CPS position nor in the portion of the decision where Dr. Babb was denied an anti-coagulation CPS position which involved at least as much use of an advanced scope as a PACT CPS position. At the time of her application she was the only applicant with an advanced scope. ¶20 *supra*.

to along with reference to EEO activity.

The District Court's opinion also overlooked testimony of Justice which contradicted the testimony relied on by the District Court concerning whether there was a position even available in MOD B in June of 2012 that Appellant could have rejected. Doc.68-3:18(p67:23-68:23). Notwithstanding Justice's testimony that no such position existed and that Howard had no authority to even offer one, the District Court referenced Appellant's supposed refusal of an "offer" several times. It did so, by the way, without addressing Appellant's understandable explanation for her actions (a job she loved) or Babb's telling Howard she had greater than 25% when they did talk about it in February 2013. ¶29 *supra.*

The District Court overlooked the statements by Justice and Wilson during an AIB in which they specifically told the AIB to target Babb, Truitt and Trask because of their perceived hostility from Babb supporting Truitt and Trask who had filed claims that older female pharmacists were being discriminated against. ¶s12,13 *supra.* This was done despite the fact that courts including the U.S. Supreme Court recognized that a plaintiff may proceed with a discrimination claim on the basis that the Appellee perceived them as engaging in protected activity. *See Heffernan v. City of Paterson,* 136

S. Ct. 1412 (2016); *Fogleman v. Mercy Hosp.* 283 F.3d 561, 571-72 (3rd Cir. 2002). This is especially significant if the Appellee claimed it was not being retaliatory but "anticipating" Babb would file an EEO. That is retaliatory under *Heffernan* and *Fogleman.* It also suggests part of its reasoning involves discrimination.

While some of the evidence that was not considered may weigh more heavily in the retaliation claim and others more heavily in a gender plus age discrimination claim, all of it provides considerable evidence going to the credibility of management. That credibility must apply in an analysis by a jury concerning what the reasons were for the actions that they are taking. If a jury believes management is disparately treating older women that is part of the circumstantial evidence which a jury is entitled to consider when deciding whether the actions taken here were because of discriminatory or retaliatory intent as opposed to some legitimate reason. To the extent management is testifying falsely in a case, it doesn't matter to their credibility whether that testimony was most material to the retaliation claim as opposed to the discrimination claim in one instance or vice versa. From the standpoint of the credibility of management, it has been called into severe question in relation to material issues in the case. *See* 11th Circuit Committee on Pattern Jury

Instructions, <u>Civil Pattern Jury Instructions</u> 3.5.1 (2013).

Moreover, the fact that one provides a false exculpatory in order to defend actions taken against the claims of discrimination and retaliation should be available for jury consideration on all of those issues. In this regard, when false exculpatories are used in a criminal case, they do not only get consideration for a particular issue when credibility is being considered. *See U.S. v. Brown*, 53 F.3d 312, 314-15 (11th Cir. 1995). Conversely, when a false exculpatory is being considered with regard to criminal intent, a jury can consider the false exculpatory as evidence of criminal intent. *See id.* ([A] statement by a Appellee, if disbelieved by the jury, may considered as *substantive evidence* of the Appellee's guilt."). In the present case, that would be evidence of retaliatory intent for the false exculpatory related to that claim and discriminatory intent for the exculpatory related to that claim or both if inextricably intertwined. In any case, management's credibility is undermined. In this case, certain false exculpatories were applicable to both discrimination and retaliation.

With regard to pretext, as discussed above management's credibility is clearly at issue. The falsehoods that management testified to with regard to its knowledge of Babb's EEO activity as well as its reason for taking away

Appellant's advanced scope which led to her not getting a GS-13 were overlooked. So was its sequential significance with other facts. Along with that, numerous pharmacists who were younger males, females and older males was, and treated better than their other older female colleagues, was also overlooked. The 25% argument was disputed by the Appellant and changed three times by management.

The District Court's order failed to consider all the circumstantial evidence in its telling sequence.

The District Court's decision should be reversed.

### B. Retaliation

Based upon the discussion under Issue I, the evidence supports finding retaliation under the *McDonnell Douglas* standard. That evidence clearly is sufficient for a jury to find retaliation was a motivating factor for adverse actions under the law applicable to federal employees. Therefore, the court's failure to analyze this case under the Federal employee motivating factor analysis was also reversible error.

## IV.  THE DISTRICT COURT ERRED IN DISMISSING THE HOSTILE WORK ENVIRONMENT CLAIM

The events listed affected Dr. Babb personally, directly and emotionally.

Doc.68-2:2-17 generally and Doc.68-2:10-13¶s19,22,23. They objectively and subjectively were hostile, severe and pervasive and affected the terms and conditions of her employment. *Id.* With regard to the hostile work environment, any one action may be within 45 days. *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002); *Shields v. Fort James Corp.,* 305 F.3d 1280, 1281-2 (11th Cir. 2002). Numerous events occurred within 45 days of May 6, 2013. They do not have to be discrete acts but some can be. *Gowski v. Peake,* 682 F.3d 1299 (11th Cir. 2012). The hostile work environment events include: denials of training (could be discrete or non-discrete); the lowered evaluation (non-discrete); the counselling and removal of educational duties (non-discrete); denial of participation in negotiation of the Agreement (non-discrete); the loss of an advanced scope (discrete act); the loss of pay (discrete act); the loss of a job she once loved (probably not a discrete act here); non-selection (discrete); observing different treatment based on protected status (non-discrete); Wilson's March 27, 2013 memo (not a discrete act); the AIB targeting (not a discrete act here given the result); the denial of a lateral move to Mod B PACT (not discrete if did not exist); the leaving of reports of contact on her desk which had no basis which was added to the EEO complaint at the administrative stage (non-discrete); the 2014 non-discrete events which are like

or related as part of a hostile work environment that occurred in 2014; and the holiday pay violation of law, management refused to correct (a discrete act). Throughout a 3 year period she experienced the distress of seeing the protected group discriminated against, she lost important duties, an advanced scope, a GS-13, saw her position, reputation and professional relationships deteriorate as she stood up for what she believed in at great expense personally and professionally.

## V. THE DISTRICT COURT ERRED BY APPLYING A STANDARD REJECTED BY THE SUPREME COURT TO APPELLANT'S QUALIFICATIONS AND FAILED TO CONSIDER THAT EVIDENCE CUMULATIVELY WITH PLAINITFF'S OTHER EVIDENCE OF PRETEXT

Appellant argued that the "slap you in the face" standard was explicitly rejected by the Supreme Court in *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456-57 (2006). Despite Appellant's argument, the District Court relied on the incorrect standard cited by Appellee: "On this point, the Eleventh Circuit has clarified that the inquiry is not who was a better candidate for the position, but rather whether the discrepancy is 'so apparent as virtually to jump off the page and slap you in the face'." *Id.*

At one time, this Court recognized the precedential effect of *Ash*: "the Court rejected the 'jump off the page and slap you in the face' standard for inferring pretext based on a comparison of qualifications." *Ash v. Tyson Foods, Inc.*, 392 Fed. App'x 817, 822 (11th Cir. 2010), *opinion vacated on reconsideration on other grounds*, 664 F.3d 883 (11th Cir. 2011); *see also Roper v. Foley*, 177 Fed. App'x 40, 49 n.8 (11th Cir. 2006). Nevertheless, the courts of the Circuit continue to apply the standard. *See, e.g., Mells*, No. 8:13-cv-3214-T-30TGW, 2015 WL 4716212, at *7 (M.D. Fla. Aug. 7, 2015).

## CONCLUSION

For the reasons set forth above the District Court's order should be reversed and the case remanded.

Respectfully submitted,

___*/s/  Joseph D. Magri*___
Joseph D. Magri
Florida Bar Number:  0814490
Merkle Magri & Meythaler, P.A.
5601 Mariner Street, Suite 400
Tampa, FL 33609-3452
Telephone:  813-281-9000
Attorneys for Appellant

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B).  This brief contains 12,614 words.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by electronic mail and UPS delivery on this 21st day of December, 2016 to:

A. Lee Bentley, III,
United States Attorney
Peter J. Sholl
New York Bar No.: 2058725
Assistant United States Attorney
400 N. Tampa St., Ste. 3200
Tampa, Florida 33602
Tel: 407/274-6000
Fax: 407/274-6102
Email: Peter.Sholl@usdoj.gov
Attorney for Appellee

  _/s/ Joseph D. Magri_____
                Joseph D. Magri